UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

KAREN ASHLEY,

     Plaintiff,

v.                           No. 5:23-CV-013-H

CLAY COUNTY, et al.,

     Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

Karen Ashley was the Chief Nursing Officer at Clay County Memorial Hospital, a county-owned facility near Wichita Falls, Texas. During her onboarding, she signed an agreement that channeled "any claim or dispute" between her and her employer to an alternate dispute resolution process. A year later, she was fired after voicing concerns about patient safety at the Hospital. Ashley filed suit, alleging that the Hospital, its foundation, Clay County, and the Hospital's physician-staffing company violated her rights under the First Amendment and state law. Soon after, the Hospital and its foundation moved to compel arbitration, which the Court granted. *See* Dkt. No. 77. But in doing so, the Court also forced the County—an apparent non-signatory to the agreement—into arbitration as well. The Fifth Circuit partially reversed the Court's order, holding that the Court erred by not first considering the County's argument that it had governmental immunity from Ashley's state-law claim. *See Ashley v. Clay County*, 125 F.4th 654 (5th Cir. 2025).

On remand, the Court granted the County's motion to dismiss the state-law claim under Rule 12(b)(1). And it asked the parties whether it should reconsider its prior order compelling arbitration. Having considered the parties' extensive briefing, the answer is yes—in part. Under her employment agreement, Ashley still must arbitrate her claims

against the Hospital and its foundation, but the County need not arbitrate, too.  Thus, the Court stays the proceedings and sends this case to arbitration.

As for the motions to dismiss, the Court denies the Rule 12(b)(1) portion of the County's motion (Dkt. No. 94) because Ashley's remaining federal claims do not implicate immunity.  Because the Hospital and Foundation asked for a mandatory stay, and because continuing litigation for the non-arbitrating parties would be inappropriate, the Court thus denies the Rule 12(b)(6) portion of the County's motion to dismiss—along with Concord's motion to dismiss (Dkt. No. 92)—without prejudice to refiling once arbitration is complete.

1.    **Factual and Procedural Background**

A.    **Factual Background**

i.    **Clay County establishes a hospital under Chapter 263 of the Texas Health and Safety Code.**

Clay County Memorial Hospital is one of Texas' few remaining county-owned hospitals.  Dkt. No. 55 ¶ 9.  The task of operating and maintaining the Hospital falls to the Board of Managers—a group of Clay County citizens appointed by the Clay County Commissioners Court for two-year terms.  *Id.*; *see also* Tex. Health & Safety Code § 263.041.  In 1992, the County also created the Clay County Memorial Hospital Foundation, a private 501(c)(3) non-profit corporation, to provide financial support to the Hospital and ensure that county residents receive adequate medical care.  Dkt. No. 55 ¶ 10.

The Board of Managers "shall generally manage and control" the Hospital's patients, officers, and employees, including "all matters relating to" the Hospital's "government, discipline, [and] contracts."  Tex. Health & Safety Code § 263.046(a).  This includes hiring the Foundation's CEO and other key administrators.  Dkt. No. 55 ¶ 11.  These individuals

handle the Hospital's day-to-day operations. *Id.* The Hospital's physicians, however, are staffed by a Lubbock-based company, Concord Medical Group PLLC. *Id.* ¶¶ 3, 11.

### ii. Ashley signs an arbitration agreement after being hired as the Hospital's Chief Nursing Officer.

In 2021, Ashley was hired to serve as the Hospital's Chief Nursing Officer. *Id.* ¶ 12. On one hand, she alleges that the Hospital and Foundation were her joint employers and that she "was under the control" of both entities. *Id.* Alternatively, due to ambiguity about the Hospital's legal status, Ashley claims that she was employed by Clay County. *Id.*

As part of her onboarding, Ashley completed a New Employee Record Sheet. *See* Dkt. No. 61-1 at 3. The Sheet's header listed "Clay County Memorial Hospital" along with the Hospital's logo. *Id.* The Sheet also detailed conditions of employment, some involving dispute resolution. One provision read: "I agree that all claims, disputes and controversies between and among employees and any employee and employer, administrative employer, or any other person shall be exclusively and finally settled through the [Alternate] Dispute Resolution Agreement printed on the reverse side of this document, which is incorporated herein by reference." *Id.* Ashley signed and dated the Sheet with her wet-ink signature:

contract. I agree that all claims, disputes and controversies between and among employees and any employee and employer, administrative employer, or any other person shall be exclusively and finally settled through the Dispute Resolution Agreement printed on the reverse side of this document, which is incorporated herein by reference. I agree that all statements made on this form may be investigated.

Signature _Karen Ashley_          Date _10-28-2021_

*Id.*; *see id.* at 1–2 (declaration from the Hospital's Human Resources Director).

In turn, the Alternate Dispute Resolution Agreement detailed the parties' intention to resolve their disputes without litigation. *See id.* at 4 (the Agreement). Relevant here, the parties broadly agreed that:

> [A]ny claim or dispute between them or against the persons or entities named above, whether related to the employment relationship or otherwise, including those created by practice, common law, court decision, or statute, now existing or created later, including any related to allegations of violations of state or federal statutes related to discrimination, and all disputes about the validity of the arbitration clause, shall by exclusively resolved, utilizing a two-step Alternate Dispute Resolution (ADR) process . . . .

*Id.* The two-step ADR process requires mediation, followed by binding arbitration under the Federal Arbitration Act, if necessary. *Id.* The parties further agreed to "giv[e] up any right they may have to sue each other," including "[a]ny right to trial by Jury or Judicial appeal." *Id.* The Agreement "survives the employment relationship." *Id.*

### iii.     Ashley flags concerns about alleged patient safety issues, including at a public Board of Managers meeting.

During her tenure as Chief Nursing Officer, Ashley reportedly uncovered a slew of patient safety concerns. She alleges, for example, that Hospital employees lost 25 vials of fentanyl, failed to follow blood-transfusion protocols, and changed the expiration date on medications. Dkt. No. 55 ¶¶ 17, 23. Ashley reports that she flagged these issues (among others) to the Hospital's leadership, but they "failed to take any action." *Id.* ¶ 17.

At the same time, Ashley began advocating for the Hospital to end its contract with Concord and begin sourcing physicians from a different company, ACPHealth. *Id.* ¶¶ 18, 19. She teamed up with the Hospital's CEO, Lisa Swenson, who "also advocated for this political change in Clay County." *Id.* ¶ 19. The Board of Managers agreed with their position, terminating the Hospital's relationship with Concord and approving a contract with ACPHealth by a vote of 3-1. *Id.* ¶ 18. One abstention came from Dr. T. David Greer, a Concord physician who—according to Ashley—was complicit in the alleged patient safety failures. *Id.* ¶¶ 13, 17–18, 23. Soon after, Dr. Greer resigned from the Board. *Id.* ¶ 13.

Less than three weeks later, the Board reversed course. *Id.* ¶ 20. The Clay County Commissioners Court installed seven additional Board members. *Id.* Dr. Greer was reappointed. *Id.* And the new Board promptly terminated its contract with ACPHealth. *Id.*

Ashley was not pleased. She arranged to speak publicly at a Board meeting a few weeks later—not as the Chief Nursing Officer, but as a private citizen. *Id.* ¶¶ 21–22. There, she detailed the missing fentanyl issue and Dr. Greer's purported failures to follow Hospital procedures. *Id.* ¶ 23. According to Ashley, she was "speaking as a citizen on matters of public concern," despite her high-level role in the Hospital hierarchy. *Id.* ¶ 22.

### iv.    Ashley is fired.

The next month, the Board of Managers, including Dr. Greer, terminated Ashley's employment. *Id.* ¶ 24. Ashley claims that she was fired because she reported "patient safety issues and the Hospital's violations of law." *Id.* And, in Ashley's telling, the Hospital, Foundation, and Clay County later engaged in a campaign of retaliation by labeling her "protected activity" as "trashing" the Hospital. *Id.* ¶¶ 24, 25. As a result, Ashley allegedly suffered lost wages, mental anguish, and reputational harm. *Id.* ¶ 27.

### B.    Procedural Background

### i.    Early Stages of Litigation

In 2023, Ashley sued the County, alleging unlawful retaliation under state law and 42 U.S.C. § 1983. Dkt. No. 1 ¶¶ 23–43; *see* Tex. Occ. Code § 301.413. She also sued Concord for state-law tortious interference. *Id.* ¶¶ 44–48. The County moved to dismiss on the ground that it was not Ashley's employer and had taken no adverse action against her. Dkt. No. 18. Ashley then amended her complaint to add the Hospital and Foundation as defendants. Dkt. No. 26. Later, given confusion surrounding the Hospital's legal status,

Ashley filed another complaint (her third), alleging that she was employed by the Hospital and Foundation or, alternatively, the County.  Dkt. No. 55 ¶ 12.

Ashley's operative complaint raises five claims: (1) state-law retaliation against the Hospital, Foundation, County, and Concord; (2) First Amendment free-speech retaliation and conspiracy under Section 1983 against the Hospital and County; (3) First Amendment associational retaliation under Section 1983 against the Hospital and County; (4) tortious interference with employment against Concord; and (5) tortious interference with prospective relations and economic advantage against Concord.  *See* Dkt. No. 90 at 2.

Again, the County maintained that it was not Ashley's employer, meaning she had failed to state a claim under Rule 12(b)(6).  *See* Dkt. No. 58 at 16.  The County also asserted governmental immunity from the state-law retaliation claim under Rule 12(b)(1).  *Id.* at 12–14.  The County made both arguments in a single motion to dismiss.  *See* Dkt. No. 58.

### ii.    Motion to Compel Arbitration

Meanwhile, the Hospital and Foundation moved to compel arbitration under the Agreement.  Dkt. No. 59.  Concord did not oppose the motion.  *Id.* at 2.  And neither did the County—a non-signatory to the Agreement—insofar as granting the motion would not require the County to arbitrate, too.  *Id.*; Dkt. No. 69 at 1–2.  For their part, the Hospital and Foundation did not expressly seek to compel the County to arbitration, and Ashley also opposed the County's involvement.  *See* Dkt. No. 65 at 12–13.  In other words, no party understood the Agreement to force the County into arbitration.

The Court saw things differently.[1]  In granting the motion to compel, the Court sua sponte ordered the County to arbitrate alongside the Hospital and Foundation, thus denying

---

[1] At the time, this case was assigned to a different district court judge.  *See* Dkt. No. 16.

the County's motion to dismiss as moot.  Dkt. No. 77.  In the Court's view, "the arbitration clause at issue is broad and encompasses *any* employer" of Ashley.  *Id.* at 1 n.1 (emphasis in original).  The County, the Court said, was also subject to the Agreement—"specifically, whether [the Agreement] applies to [the] County or not."  *Id.*  On the Court's reading of the Agreement, "any question of who is a party to the arbitration agreement is itself subject to arbitration."  *Id*.  That said, the Court declined to dismiss the case, choosing instead to stay and administratively close the case pending the outcome of the arbitration.  *Id.* at 4–5.  And it denied all other pending motions—including a motion to dismiss from Concord—as moot without prejudice to refiling.  *Id.* at 5; *see* Dkt. No. 56.

The County, maintaining its governmental immunity and non-employer status, moved for reconsideration.  Dkt. No. 78.  The Court denied the motion, Dkt. No. 79, and the County appealed.  Dkt. No. 80.  At the County's request, the Court stayed its order compelling arbitration pending appeal.  Dkt. Nos. 82; 83.

### iii.    The Fifth Circuit's Decision

The Fifth Circuit reversed, holding that the Court erred in ruling on the motion to compel arbitration without first resolving the County's assertion of governmental immunity under Texas law.[2]  Dkt. No. 87 at 10; *see Ashley*, 125 F.4th at 662.  The Fifth Circuit did not address the merits of the immunity question, nor did it resolve any of the other issues (like the County's employer status) that the Court deferred to arbitration.  *See* Dkt. No. 77.  Instead, the Fifth Circuit remanded "with instructions for the district court to resolve the

---

[2] The Fifth Circuit also concluded that it had appellate jurisdiction under the collateral-order doctrine.  *See* Dkt. No. 87 at 8; *see Helton v. Clements*, 787 F.2d 1016, 1017 (5th Cir. 1986).

issue of governmental immunity as it pertains to the County's motion to dismiss before it rules on the motion to compel arbitration."[3]  Dkt. No. 87 at 11.

### iv.    Post-Remand

On remand, the Court granted the County's motion to dismiss in part, concluding that the County had governmental immunity from Ashley's state-law retaliation claim and that the Court thus lacked jurisdiction over that portion of the suit.  Dkt. No. 90; *see* Fed. R. Civ. P. 12(b)(1).  The Court otherwise "reserve[d] ruling on the 12(b)(6) portion of the motion until [it] has resolved the motion to compel arbitration."  Dkt. No. 90 at 8.

By that point, the parties had differing views on how to proceed.  Ashley maintained that the Court had to start its arbitration analysis from scratch—deciding, specifically, "whether the governmental entities have capacity to arbitrate."  Dkt. No. 89 at 2.  The Hospital and Foundation, on the other hand, argued that the Fifth Circuit did not broadly reverse the Court's order compelling arbitration and that it would be improper for the Court to reconsider its bottom-line conclusion.  *Id.* at 4 & n.3.  For its part, the County asked to file a new Rule 12(b)(6) motion in light of an intervening decision from the Wichita Falls Division, *Swenson v. Clay County Memorial Hospital*, where Chief Judge O'Connor concluded on similar facts that Clay County was not the former Hospital CEO's employer and thus dismissed her claims against the County before sending the case to arbitration under the same Agreement.[4]  *Id.* at 2–3; *see* 7:23-CV-056, Dkt. No. 58 (N.D. Tex. Mar. 25, 2024).  Like Ashley, the County asked the Court in a later order to take another stab at the motion

---

[3] After the mandate issued, the Clerk of Court transferred the case to the undersigned district judge.

[4] Recall that the former CEO, Lisa Swenson, teamed up with Ashley to advocate for terminating the Hospital's contract with Concord and switching to ACPHealth.  *See supra*, Section 1.A.iii.

to compel arbitration.  Dkt. No. 100 at 1.  Concord—which no one maintains is a party to the Agreement—also wanted to file a new motion to dismiss.  Dkt. No. 89 at 5.

Given the confusion, the Court ordered the parties to each file a response explaining whether reconsideration of its prior order compelling arbitration is "necessary, available, and timely."  Dkt. No. 91 at 2.  Moreover, Concord was told to file a new motion to dismiss Ashley's operative complaint.  *Id.*  And the County was instructed to file a supplemental brief or a new Rule 12(b)(6) motion, "attaching any evidence that it believes is necessary to resolving the dispute of whether the County was Ashley's employer."  *Id.*  The Court also allowed the parties to reply to the responses on reconsideration.  *Id.*

Several matters, then, are before the Court.  First is whether to reconsider the Court's prior order compelling arbitration.  *See* Dkt. Nos. 98–102.  Second is Concord's motion to dismiss under Rule 12(b)(6).  Dkt. No. 92.  And third is the County's motion to dismiss the remaining federal claims under Rule 12(b)(1) and Rule 12(b)(6).  Dkt. No. 94.  The matters have been fully briefed (*see* Dkt. Nos. 103–06; 108) and are ripe for review.

## 2.    Legal Standards

### A.    Federal Arbitration Act

"Under the Federal Arbitration Act, parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019).  Section 2 of the FAA requires treating written arbitration agreements as "valid, irrevocable, and enforceable."  9 U.S.C. § 2.  The Supreme Court has framed the FAA as "embodying a national policy favoring arbitration."[5]

---

[5] So too has the Supreme Court of Texas.  *See, e.g.*, *In re Whataburger Restaurants LLC*, 645 S.W.3d 188, 198 (Tex. 2022) ("Federal and state policies favor arbitration for its efficient method of resolving disputes . . . ." (quoting *Rachal v. Reitz*, 403 S.W.3d 840, 842 (Tex. 2013))).

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (internal alterations omitted) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).  So "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

This strong federal policy, however, "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties."  *Lloyd's Syndicate 457 v. FloaTEC, LLC*, 921 F.3d 508, 516 n.5 (5th Cir. 2019) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)).  After all, arbitration agreements are contracts, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960); *see Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019) ("[A]rbitration is strictly a matter of consent." (quotation omitted)).  The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).

The FAA provides "for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement."  *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (citing 9 U.S.C. §§ 3–4).  In the Fifth Circuit, courts use a two-step analysis when resolving a motion to compel arbitration under the FAA.  "The first is contract formation— whether the parties entered into *any arbitration agreement at all*."  *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (emphasis in original).  This question is for the court: "Where the very existence of any [arbitration] agreement is disputed, it is for the courts to decide at the outset whether an agreement was reached, applying state-law principles of contract."  *Will-Drill*, 352 F.3d at 218.  At the first step, the normal

presumption in favor of arbitration "disappears." *O'Shaughnessy v. Young Living Essential Oils, LC*, 810 F. App'x 308, 311–12 (5th Cir. 2020) (quotation omitted).

If the court concludes that an arbitration agreement exists, it goes on to the second step: "whether *this* claim is covered by the arbitration agreement." *Kubala*, 830 F.3d at 201 (emphasis in original). Again, the second step is most often a question for the court. *Id.* But "the analysis changes" when the arbitration agreement includes a delegation clause that punts certain issues—including the validity of the agreement itself—to the arbitrator. *Id.*; *see Edwards v. Doordash, Inc.*, 888 F.3d 738, 744–45 (5th Cir. 2018) (citing *Rent-A-Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010)). In those cases, "the court's analysis is limited." *Kubala*, 830 F.3d at 202. "It performs the first step—an analysis of contract formation—as it always does." *Id.* But if an agreement to arbitrate exists under the FAA, the "only question" at step two is "whether the purported delegation clause is in fact a delegation clause"—that is, if it "evinces an intent" to have the arbitrator decide a given issue, like the validity of the underlying arbitration agreement. *Id.*; *see Edwards*, 888 F.3d at 744. "If there is a valid delegation, the court must grant the motion to compel." *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 279 (5th Cir. 2019).

When ruling on a motion to compel arbitration, courts may consider "the pleadings and evidence on file." *Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 443–44 (N.D. Tex. 2019); *see also Gezu v. Charter Commc'ns*, 17 F.4th 547, 552–54 (5th Cir. 2021) (looking to declarations outside the pleadings as evidence that the parties had formed an agreement to arbitrate). The party seeking to compel arbitration must prove the existence of an agreement to arbitrate by a preponderance of the evidence. *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012). In the end, a motion to compel must be granted "unless it may be

said with positive assurance" that the arbitration clause does not apply. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quotation omitted).

### B.    Reconsideration

The Federal Rules of Civil Procedure do not expressly authorize motions for reconsideration. *Bass v. U.S. Dep't of Agric.*, 211 F.3d 959, 962 (5th Cir. 2000). Still, parties may seek reconsideration of an interlocutory order under Rule 54(b). *Austin v. Kroger Tex., LP*, 864 F.3d 326, 336 (5th Cir. 2017). An order compelling arbitration is interlocutory where, as here, it stays and administratively closes the case. *Sw. Elec. Power Co. v. Certain Underwriters at Lloyds of London*, 772 F.3d 384, 387–88 (5th Cir. 2014); *see* Dkt. No. 77 at 4–5. The order is thus considered under Rule 54(b), as other courts have found. *See, e.g.*, *Black v. Experian Info. Sols.*, No. H-21-4231, 2022 WL 1809307, at *1 (S.D. Tex. June 2, 2022).

Rule 54(b) "authorizes the district court to 'revise[] at any time' 'any order or other decision . . . [that] does not end the action.'" *Austin*, 864 F.3d at 336 (alterations in original) (quoting Fed. R. Civ. P. 54(b)). The standard is less exacting than Rule 59(e)'s requirements for reconsidering final judgments. *See Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (noting that Rule 59(e) is meant to "correct manifest errors of law or fact or to present newly discovered evidence" (quotation omitted)). Rather, when addressing an interlocutory order under Rule 54(b), "the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin*, 864 F.3d at 336 (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds*, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 n.14 (5th Cir. 1994) (en banc)).

– 12 –

### 3.    Analysis

As explained below, the Court will reconsider in part its prior order compelling arbitration.[6] *See* Dkt. No. 77.  Ashley still must arbitrate her claims with the Hospital and Foundation.  But the Court should not have forced the County to participate, too.  Indeed, no party then—and no party now—wanted the County to arbitrate.  Whether there is an agreement to arbitrate is always a question for the court, *Kubala*, 830 F.3d at 201, and "the FAA does not require parties to arbitrate when they have not agreed to do so."  *Volt*, 489 U.S. at 478.  The Court did not previously address the evidence—later detailed in *Swenson*—that the County is not Ashley's employer and, therefore, is not a party to the Agreement.

As for the motions to dismiss, the Court denies the Rule 12(b)(1) portion of the County's motion because Ashley's remaining federal claims do not present an immunity problem.  Given the pending arbitration, though, it is too soon to decide the Rule 12(b)(6) portions of the County's and Concord's motions to dismiss.  So the Court denies them without prejudice to refiling once arbitration is complete—as it did before.

#### A.    Under Rule 54(b), the Court will reconsider in part its prior order compelling arbitration.

In a footnote, the Court previously concluded that Clay County "is also subject to the arbitration clause—specifically, whether it applies to Clay County or not."  Dkt. No. 77 at 1 n.1 (further reasoning that "any question of who is a party to the arbitration agreement

---

[6] To be clear, reconsideration does not follow from the Fifth Circuit's judgment and mandate.  The Fifth Circuit did not instruct the Court to start from scratch on remand; it only reversed the Court's order compelling arbitration "insofar as it declined to address the County's motion to dismiss on the basis of governmental immunity under Texas law."  Dkt. No. 90 at 3 (quoting Dkt. No. 87 at 2).  The Court fulfilled that mandate by dismissing Ashley's state-law claim against the County.

is itself subject to arbitration").  Accordingly, the Court required the County to arbitrate.  *Id.*  For three reasons, that conclusion—and that conclusion alone—warrants reconsideration.

First, the Court's prior order improperly tasked the arbitrator with deciding whether the County is subject to the Agreement.  Again, it is a court's duty to decide "at the outset" whether there was an agreement to arbitrate between the parties.  *Will-Drill*, 352 F.3d at 218; *see also Lloyd's Syndicate 457*, 921 F.3d at 515 ("We have consistently treated attacks on an arbitration agreement's existence as step one matters for courts, not arbitrators.").  Because the County disputes that it ever agreed to arbitrate with Ashley, the Court must resolve the contract-formation question for itself.  *Kubala*, 830 F.3d at 201.

The Agreement adheres to that principle, contrary to the Court's prior reasoning.[7] *See* Dkt. No. 77 at 2.  It governs all "claims and disputes involving Employer's customers and clients, administrative employers, all agents and other employees, all subsidiaries, affiliates and parent companies and any other person or entity *that has agreed to this process*."  Dkt. No. 61-1 at 4 (emphasis added).  Of course, the County alleges that, because it was not Ashley's employer, it did *not* agree to the process detailed in the Agreement.  Dkt. No. 100 at 10.  In such cases, the onus is on the court, not the arbitrator, to resolve the dispute without any thumb on the scale for arbitration.  *See O'Shaughnessy*, 810 F. App'x at 312.

Next, the Court misunderstood its authority to consider evidence in resolving a motion to compel arbitration.  In denying the County's motion for reconsideration (Dkt.

---

[7] The Court reasoned that the Hospital and Foundation also understood the Agreement to require arbitration over who was bound by the Agreement.  Dkt. No. 77 at 1 n.1.  True, those parties suggested that the "gateway" issue of whether a party is subject to the Agreement falls within its delegation clause, which provides that "all disputes about the validity of the arbitration clause" are reserved for the arbitrator.  *See* Dkt. No. 60 at 7.  But as explained more below, validity is different from formation.  *See infra*, Section 3.A.ii.

No. 78), the Court reasoned that the County's arguments about its non-employer status were "premised upon the review of evidence and documents—something reserved for summary judgment." *See* Dkt. No. 79 at 1.  But courts routinely treat motions to compel arbitration like motions for summary judgment.  *See Jackson*, 389 F. Supp. 3d at 443–44 & n.6 (Ramirez, J.) (collecting cases).  That makes sense: an order compelling arbitration "is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Grant v. House of Blues New Orleans Restaurant Corp.*, Civ. A. No. 10-3161, 2011 WL 1596207, at *3 (E.D. La. Apr. 27, 2011) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 528, 532 (3d Cir. 2009)); *see also* 9 U.S.C. § 4 (a district court should not order arbitration unless it is "satisfied that the making of the [arbitration] agreement or the failure to comply therewith is not in issue").  Nothing about the procedural posture bars the Court from considering the County's evidence that it was not Ashley's employer.

Lastly, Chief Judge O'Connor's decision in *Swenson*—which was not available when the Court issued its initial order—weighs heavily here.  That case closely tracks this one: it also involved a Hospital employee—caught up in the same underlying dispute—who tried to stave off arbitration under the same Agreement.  *See Swenson v. Clay Cnty. Mem'l Hosp.*, 7:23-CV-056, 2024 WL 262576, at *2 (N.D. Tex. Jan. 24, 2024).  There too the County resisted arbitration on the grounds that it was not the plaintiff's employer—thus, it could not be subject to the plaintiff's claim under the Texas Whistleblower Act.  *Id.* at *1.  Relying on similar evidence to what is before this Court, Chief Judge O'Connor ultimately concluded that the County was not the plaintiff's employer and thus declined to force the County into

arbitration under the Agreement.[8]  7:23-CV-056, Dkt. No. 58 at 3–4.  There is no reason to deviate from that decision here.  *See infra*, Section 3.A.i.a.

For these reasons, the Court will reconsider the portion of its prior order requiring the County to participate in arbitration.[9]  *See* Dkt. No. 77 at 1 n.1

### i.    Based on the evidence provided, Clay County was not Ashley's employer and is therefore not a party to the Agreement.

On reconsideration, the key step-one question is whether Clay County was Ashley's employer.  If so, then the County is a party to the Agreement, and Ashley's claims against it must be resolved in arbitration.  *See* Dkt. No. 61-1 at 4 (providing for a two-step ADR process between "Employer and Employee").  The undisputed evidence, however, tells a different story: it shows that Ashley was not employed by the County.  Thus, the County will not be forced to arbitrate Ashley's claims under the Agreement.

Take, for example, Chapter 263 of the Texas Health and Safety Code, which governs county-owned hospitals.  It provides that the Hospital's Board of Managers, not the County, "shall generally manage and control the hospital," including "its officers and employees" and "all matters relating to its government, discipline, contracts, and fiscal concerns."  Tex. Health & Safety Code § 263.046(a).  The Board also determines the salaries of Hospital employees.  *Id.* § 263.047.  Moreover, the Hospital's superintendent, not a County official, can discharge an employee at his or her discretion.  *Id.* § 263.076(c).  The statute suggests, then, that the Hospital manages its own affairs, including the hiring and firing of employees.

---

[8] Chief Judge O'Connor at first agreed with the Court's prior reasoning in this case before reversing course on reconsideration.  *See Swenson*, 2024 WL 262576, at *2.

[9] While neither Ashley nor the County filed a formal motion for reconsideration following the Fifth Circuit's remand, the Court construes their responses (Dkt. Nos. 98; 100) as such motions.

Case law supports this arrangement. Courts, including the Fifth Circuit, have resolved employment-related suits against county-owned hospitals without reference to county control. In *Sosa v. Board of Managers of Val Verde Memorial Hospital*, for example, the Fifth Circuit described the Board of Managers of a Texas county-owned hospital as the hospital's "governing body." 437 F.2d 173, 174 (5th Cir. 1971). It then addressed claims that the Board violated the law in exercising its "broad discretion" to deny the plaintiff doctor's admission to the hospital's medical staff. *Id.* at 176–77; *see Gaalla v. Citizens Med. Ctr.*, 407 F. App'x 810, 813–14 (5th Cir. 2011) (similar). These cases suggest that county-owned hospitals in Texas operate independently from the county, particularly when it comes to matters of employment.

The Texas Attorney General agrees. One AG opinion provides that the hospital's superintendent and Board of Managers "hold[] the power to appoint hospital employees" and that "[n]either the [county] commissioners court nor the county judge . . . holds such authority." Op. Tex. Att'y Gen. No. KP-0045, at 2 (2015) (citing Tex. Health & Safety Code § 263.076(a)). Further, the Board "is not accountable on a day-to-day basis to the commissioners court." *Id.* at 2 n.3 (quotation omitted). Another AG opinion, this one from then-AG Abbott, agrees: "Once the County has made the requisite determinations and acquired the property, the hospital board of managers has express authority to manage the facility, personnel, and patients consistently with legal requirements." Op. Tex. Att'y Gen. No. GA-0552, at 3 (2007) (citation omitted). Though Texas Attorney General opinions are not binding as a matter of state law, *Hartzell v. S.O.*, 672 S.W.3d 304, 318 (Tex. 2023), they reinforce that the County was not Ashley's employer.

The record confirms what the legal authority makes clear.  The County's name or logo appears nowhere on the Agreement or the New Employee Record Sheet.  *See* Dkt. No. 61-1 at 3–4.  The only defendant listed on either document is the Hospital.  *Id.* at 3.  Nor does the County have any record of Ashley's employment, a fact the County Treasurer confirmed in a sworn statement.  Dkt. No. 95-6 at 2.  Moreover, the Hospital's by-laws confirm that the Board of Managers "is responsible for the appointment of qualified and competent medical staff," Dkt. No. 95-14 at 6, and one of the County Commissioners clarified that the County "did not ever employ Ms. Ashley" or exercise any control or influence over the Hospital's decision to hire and terminate her.  Dkt. No. 95-11 at 2.

Taking all this evidence together, the County has shown that it was not Ashley's employer and, therefore, was not a party to the Agreement.

### a.    The intervening decision in *Swenson* is persuasive.

Chief Judge O'Connor relied on similar evidence in concluding that Clay County did not employ the Hospital CEO in *Swenson*.  *See* 7:23-CV-056, Dkt. No. 58 at 3–4.  He noted that, as here, there was testimony from the Clay County Commissioners that "they had no right to direct or control Plaintiff's employment and that Plaintiff was not a County employee."  *Id.* at 3.  And he also found persuasive the Texas Attorney General opinions, which reiterate that county officials have no authority to hire hospital employees.  *Id.* at 3–4.  While Chief Judge O'Connor initially sided with this Court's original rationale for sending the County to arbitration, *see Swenson*, 2024 WL 262576, at *2 (citing 5:23-CV-013, Dkt. No. 77), he reconsidered that position after reviewing the County's evidence of its non-employer status.  The Court does the same here.

### b.   There is no sign that the County is a bound non-signatory to the Agreement.

While the evidence proves that the County was not Ashley's employer, there is one more matter to consider: whether the County is nevertheless a bound non-signatory to the Agreement.  The Court need not dwell on this point, since no party argues that the County must arbitrate on this theory.  *See* Dkt. No. 100 at 20.  But, suffice it to say, "[a]rbitration agreements apply to nonsignatories only in rare circumstances." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 358 (5th Cir. 2003).  Non-signatories may be bound to an arbitration agreement under six principles of contract and agency law: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary.  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005).  While it is the Court's job to assess contract formation at step one, *Kubala*, 830 F.3d at 201, there is no allegation that any of these doctrines bind the County to the Agreement as a non-signatory.  Because the party seeking to compel arbitration must prove that an agreement exists, *In re Kellogg*, 166 S.W.3d at 737, and because no party seeks to have the County arbitrate here, the Court need not address whether any of the above-stated doctrines apply.

### ii.   Under the Agreement, Ashley must still arbitrate her claims against the Hospital and Foundation, as the Court originally found.

While Ashley's claims against the County are not subject to arbitration, the same cannot be said for her claims against the Hospital and Foundation.  To begin, there can be no dispute that the Agreement binds Ashley, the Hospital, and the Foundation.[10]  Ashley signed the New Employee Record Sheet, which incorporates the Agreement and lists "Clay

---

[10] There has been no assertion that it binds Concord, too.  *See* Dkt. Nos. 99 at 2; 101 at 6.

– 19 –

County Memorial Hospital" at the top. *See* Dkt. No. 61-1 at 3. And the Hospital's Human Resources Director declared that Ashley completed the form during her onboarding process with the Hospital. *Id.* at 1–2. As for the Foundation, the Agreement contemplates joint employers which, according to Ashley's own allegations, include the Hospital and Foundation. *Id.* at 4; *see* Dkt. No. 55 ¶ 12 (Third Amended Complaint alleging that "[A]shley was jointly employed by both the Foundation and the Hospital" or, alternatively, the County). Therefore, unlike with the County, there is no step-one question about the existence of an agreement to arbitrate with the Hospital and Foundation.

Turning to the text, the Agreement broadly refers to the ADR process "any claim or dispute" between the parties, "whether related to the employment relationship or otherwise, including those created by practice, common law, court decision, or statute." Dkt. No. 61-1 at 4. The New Employee Record Sheet, which Ashley signed, is much the same: "I agree that all claims, disputes and controversies between and among employees and any employee and employer . . . shall be exclusively and finally settled through the [Agreement]." *Id.* at 3. That expansive language covers Ashley's claims, as the Court originally found. Dkt. No. 77 at 1–2. Still more, by signing the Agreement, the parties "[gave] up any right they may have to sue each other" and "expressly waived" any jury trial or judicial appeal. Dkt. No. 61-1 at 4. Thus, Ashley must pursue her claims against the Hospital and Foundation in arbitration.

Ashley resists this conclusion, arguing that the Court must determine the Hospital's "capacity to arbitrate"—that is, whether it "had the authority to enter into an arbitration agreement." Dkt. No. 98 at 10–11. That, however, is a question for the arbitrator. Under the Agreement's delegation clause, "all disputes about the validity of the arbitration clause" must be resolved through the ADR process. Dkt. No. 61-1 at 4. Whether the Hospital had

authority to contract for arbitration goes to the Agreement's validity; it does not present a step-one formation question that, as explained above, is the province of the Court. *See Rent-A-Ctr.*, 561 U.S. at 70 n.2. Nor is it a question of immunity, as Ashley at times suggests. *See* Dkt. No. 98 at 10–11 (citing *San Antonio River Auth. v. Austin Bridge & Rd., LP*, 601 S.W.3d 616, 626 (Tex. 2020)). As the Court previously found, any challenge to the validity of the Agreement—including Ashley's allegation that the Hospital lacked authority to execute the Agreement in the first place—must be referred to arbitration. *See* Dkt. No. 77 at 4.

*            *            *

In sum, the Court reconsiders the portion of its prior order (Dkt. No. 77) forcing the County to arbitrate Ashley's claims against it. Whether Ashley and the County agreed to arbitrate is a question for the Court, not the arbitrator. And here, the evidence shows that the County was not Ashley's employer, meaning it did not agree to arbitrate. Thus, the County is not bound by the Agreement—as a signatory or otherwise. But the rest of the Court's order holds true: under the Agreement's plain terms, Ashley's claims against the Hospital and Foundation must be resolved through arbitration.

> **B.      The Court stays and administratively closes this case pending arbitration.**

"If a dispute is subject to mandatory grievance and arbitration procedures, then the proper course of action is usually to stay the proceedings pending arbitration." *Ruiz v. Donahoe*, 784 F.3d 247, 249 (5th Cir. 2015). The stay often coincides with administrative closure. *See Mire v. Full Spectrum Lending Inc.*, 389 F.3d 163, 167 (5th Cir. 2004).

There is no reason to treat this case differently. Indeed, in their motion to compel, the Hospital and Foundation expressly requested a stay pending completion of arbitration

– 21 –

proceedings.[11]  Dkt. No. 60 at 9.  Under Section 3 of the FAA, a district court must stay proceedings upon the application of a party if it is "satisfied that the issue involved in such suit or proceeding is referable to arbitration."  9 U.S.C. § 3.  In those situations, the Court "has no discretion under [S]ection 3 to deny the stay."  *Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754 (5th Cir. 1993) (quotation omitted).

But the Court does have wide discretion to extend the stay to proceedings against the County and Concord—the two non-signatories.  *Id.* at 755.  And it does so here.  The Court's authority to issue a discretionary stay of litigation pending arbitration, even for claims involving non-arbitrating parties, stems from its inherent power to control its docket.  *Id.* (citing *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20 n.23).  Factors to consider include whether "(1) the arbitrated and litigated disputes involve the same operative facts; (2) the claims asserted in the arbitration and litigation are 'inherently inseparable'; and (3) the litigation has a 'critical impact' on the arbitration."  *Rainier DSC 1, LLC v. Rainier Cap. Mgmt., LP*, 828 F.3d 356, 360 (5th Cir. 2016) (quoting *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 343 (5th Cir. 2004)).  "District courts within the Fifth Circuit have held that it is not absolutely necessary that the claims be inherently inseparable in order to justify a discretionary stay; significant overlap of claims is sufficient."  *Neukranz v. Conestoga Settlement Servs., LLC*, No. 3:19-CV-1681, 2020 WL 4679542, at *4 (N.D. Tex. July 14, 2020) (Ramirez, J.) (quotation omitted).

Here, Ashley's claims against the County and Concord involve the same set of facts as the claims that are subject to arbitration.  Central to all of them are Ashley's allegations

---

[11] Alternatively, they requested that the Court dismiss the case outright.  Dkt. No. 60 at 8–9.  But that approach is only proper "when all of the issues raised in the district court must be submitted to arbitration," which is not true here.  *Ruiz*, 784 F.3d at 249–50 (emphasis omitted).

that the defendants violated her constitutional rights and undermined her employment at the Hospital. In fact, two of the three claims against the Hospital and Foundation that must be brought in arbitration—Count Two involving First Amendment free-speech rights and Count Three involving First Amendment associational rights—were also alleged against the County. Dkt. No. 55 ¶¶ 40; 50. In other words, Ashley's remaining claims against the County are "inherently inseparable" from those that she must pursue in arbitration. *Waste Mgmt.*, 372 F.3d at 343 (quotation omitted). That factor supports a discretionary stay.

The analysis for Concord is largely the same. The remaining state-law claim against the Hospital and Foundation—alleging unlawful retaliation under Section 301.413 of the Texas Occupations Code—was also alleged against Concord. Dkt. No. 55 ¶¶ 31–32. While Ashley alleged two separate state-law causes of action against Concord only, those claims—involving tortious interference with employment—still overlap factually with the claims in arbitration. *See id.* ¶¶ 53–57. "The 'close relationship' between the facts supporting all of the claims weighs in favor of a stay." *Neukranz*, 2020 WL 4679542, at *5 (quotation omitted). Lastly, when resolving litigated disputes during a pending arbitration, there is always the concern that, "[g]iven the binding effect of a federal judgment" and the "factual similarities" in the claims, the arbitrator would "be strongly influenced to follow the Court's determination." *Broussard v. First Tower Loan, LLC*, 150 F. Supp. 3d 709, 728 (E.D. La. 2015). Therefore, allowing the litigation to proceed against the non-signatories risks "critical impact" on the arbitration. *Waste Mgmt.*, 372 F.3d at 343 (quotation omitted).

Against that backdrop, the Court stays proceedings as to all the defendants and administratively closes this case pending the outcome of the arbitration.

## C. The Court denies the Rule 12(b)(1) portion of the County's motion to dismiss and denies what is left without prejudice to refiling.

One question remains: what about the pending motions to dismiss?  After remand, Concord and the County both filed renewed motions to dismiss.  *See* Dkt. Nos. 92; 94. Concord's motion arises solely under Rule 12(b)(6); the County presses arguments under both Rule 12(b)(1) and Rule 12(b)(6).  But the County's jurisdictional challenge lacks merit, and it is premature to decide whether Ashley states a claim for relief against either defendant.  Thus, the Court denies the Rule 12(b)(1) portion of the County's motion to dismiss and denies what is left—Concord's motion to dismiss and the Rule 12(b)(6) portion of the County's motion—without prejudice to refiling once arbitration is complete.

### i. The County's jurisdictional challenge is meritless.

The Fifth Circuit was clear: "Motions to compel arbitration are not one of the limited instances in which district courts have leeway to pretermit the resolution of jurisdictional challenges."  *Ashley*, 125 F.4th at 661 (quoting *Hines v. Stamos*, 111 F.4th 551, 566 (5th Cir. 2024)).  So before sending this case to arbitration, the Court must resolve the Rule 12(b)(1) portion of the County's motion to dismiss.  *See* Dkt. No. 94 at 15–24.

That said, the County's argument falls flat.  In the County's view, the Court lacks jurisdiction over Ashley's remaining federal claims because the County was not her employer and so its "governmental immunity is not waived for [Ashley's] claims based on her termination."  *Id.* at 24.  True, "the County's governmental immunity defense raises a jurisdictional inquiry."  *Ashley*, 125 F.4th at 662.  But the only claims left against the County arise under Section 1983, and it is black-letter law that counties are not immune from suit

– 24 –

under that statute.[12]  *Howlett v. Rose*, 496 U.S. 356, 376 (1990); *accord Dallas County v. Gonzales*, 183 S.W.3d 94, 109 (Tex. App.—Dallas 2006, pet. denied); *see also Hoff v. Nueces County*, 153 S.W.3d 45, 49–50 (Tex. 2004) (holding that Texas counties are not arms of the state for purposes of Eleventh Amendment immunity).  Plus, the County seemingly assumes that a Section 1983 claim cannot lie against a county that was not the plaintiff's employer.  *See* Dkt. No. 94 at 15–16.  But Ashley alleges that the County conspired against her for exercising her First Amendment rights, even if it did not formally terminate her.  Dkt. No. 104 at 16–17, 23.  Thus, the County's arguments are properly resolved under the rubric of Rule 12(b)(6).  Its jurisdictional challenge under Rule 12(b)(1) is denied.

### ii.    Because the Court stays all proceedings, the remaining motions to dismiss are moot.

Having stayed all litigation, it is premature for the Court to resolve Concord's motion to dismiss under Rule 12(b)(6), as well as the Rule 12(b)(6) portion of the County's motion to dismiss.  *See Moore v. Gold Strike Casino Resort, LLC*, 3:25-CV-270, 2026 WL 560238, at *2 (N.D. Miss. Feb. 27, 2026) (denying motion to dismiss without prejudice to renewal following arbitration).  Accordingly, those motions (Dkt. Nos. 92; 94) are denied as moot without prejudice to refiling once arbitration is complete.

### 4.    Conclusion

In sum, under Rule 54(b), there is good cause to reconsider in part the Court's prior order compelling arbitration.  *See* Dkt. No. 77.  While Ashley still must arbitrate her claims against the Hospital and Foundation, the same is not true for Concord or the County.  The

---

[12] Ashley concedes, as she must, that she cannot recover punitive or exemplary damages from the County.  Dkt. No. 104 at 28; *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding that municipalities are immune from punitive damages under Section 1983).  Thus, her claim for punitive or exemplary damages against the County, *see* Dkt. No. 55 ¶ 58, is dismissed.

evidence shows that the County was not Ashley's employer, so it never agreed to arbitrate any disputes with her. Thus, the County will not be forced to arbitrate.

The County's jurisdictional challenge under Rule 12(b)(1), however, is unavailing. So that portion of its motion to dismiss (Dkt. No. 94) is denied. Next, because the Hospital and Foundation requested a mandatory stay, and because continuing litigation for the non-arbitrating parties would be inappropriate, the Court denies the Rule 12(b)(6) portion of the County's motion to dismiss—as well as Concord's motion to dismiss under Rule 12(b)(6) (Dkt. No. 92)—without prejudice to refiling once arbitration is complete. The Hospital and Foundation's motion to compel arbitration (Dkt. No. 59) is granted: Ashley must pursue her claims against those defendants in accordance with the Agreement.

The Clerk of Court is directed to administratively close this case. The parties are ordered to file a joint status report within 30 days of the arbitration's completion explaining how they propose to proceed with this case.

So ordered on March 30, 2026.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE